Filed 11/22/24  P. v. Espinoza CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>IGNACIO ESPINOZA,<br><br>    Defendant and Appellant. | H051119<br>(Santa Clara County<br>Super. Ct. No. C2114192) |

Defendant Ignacio Espinoza appeals from a final judgment in a criminal action following a court trial under Penal Code section 1192 to determine whether the murder defendant admitted committing was of the first or second degree.  Appointed counsel filed an opening brief summarizing the case but raising no issues.  We notified defendant of his right to submit written argument on his own behalf.  Defendant responded by filing a two-page handwritten supplemental brief.

Pursuant to *People v. Wende* (1979) 25 Cal.3d 436 and *People v. Kelly* (2006) 40 Cal.4th 106, we have reviewed the entire record and find no arguable issue on appeal. Following the California Supreme Court's direction in *Kelly*, we provide "a brief description of the facts and procedural history of the case, the crimes of which the defendant was convicted, and the punishment imposed."  (*Id.* at p. 110.)  We also discuss defendant's contentions and explain why we will affirm the judgment.  (*Ibid.*)

## I.    SUMMARY OF PROCEEDINGS

Defendant was charged with murder (Pen. Code, § 187, subd. (a); count 1; unspecified statutory references are to the Penal Code), violating a protective order (§ 273.6, subd. (a); count 2), two counts of making criminal threats (§ 422, subd. (a); counts 3 and 4), and spousal battery (§ 243, subd. (e)(1); count 5).  Count 1 included an allegation that defendant used a deadly weapon in the commission of the offense. (§ 12022, subd. (b)(1).)  The operative amended complaint also alleged defendant had suffered four prior convictions:  for forcible rape (§ 261, subd. (a)(2)), forcible sexual penetration (§ 289, subd. (a)(1)), committing a lewd act on a child under 14 years old (§ 288, subd. (a)), and sexual penetration with a foreign object on a child under 14 years old (§ 289, subd. (j).)  (§§ 667.5, subd. (c), 1170.12, subd. (b)(1), 1192.7, subd. (c).) Defendant pleaded no contest on all counts and admitted the charged allegations.  A court trial commenced in 2022 for the sole purpose of determining whether defendant was guilty of first degree or second degree murder for the killing of his estranged wife, Rosemary Sanchez Espinoza.  (§ 1192.)

The husband of defendant's cousin testified that on October 27, 2021, defendant arrived at his house unexpectedly and began washing his hands and clothes.  Defendant asked for tequila, a change of clothes, and garbage bags to put his bloody socks in.  He said he had gotten into a fight with his wife and her boyfriend.  When asked "What if you killed her?", defendant replied, "Too bad.  I grabbed her by the neck and I told her – I told you I was going to kill you, bitch."  Defendant asked for a ride to the bus station so he could go somewhere, possibly Mexico.  He said one of his children would pick up his car from the house.

Defendant's son testified that he had been living with his mother at the time she was murdered, and was not speaking to his father because he had been threatening her. He last saw his mother around 7:00 or 7:30 a.m. on the morning of the murder.  Later, when he identified her body, he noticed injuries to her face and hands that were not

2

apparent that morning. About two weeks earlier, he had been present when his father confronted his mother. Defendant had been "weird, crazy," and "all over the place." He said he wanted to get back together with his wife; when she calmly replied that she did not want to get back together with him, he said he wanted her retirement savings. He grabbed her arm, threatened to kill her and her boyfriend, and also threatened to kill his son when he attempted to intervene.

Defendant's nephew testified that defendant had stayed at his house the night before the murder. At some point that night, defendant asked to use his nephew's phone to call his wife. (He could not use his own phone to call her because she had blocked his number.) His nephew said no, gave him a beer, and told him to focus on himself. A few days earlier, defendant's nephew had overheard defendant talking on the phone and saying he would kill someone if he had to go back to prison. On the day of the murder, defendant's nephew awoke to his dog barking and police approaching his house. He went outside and saw a woman lying in the driveway with blood on her face. Defendant and his car were gone.

Defendant's daughter testified that she had last seen her mother on the morning she was murdered, and went to the hospital later that day when she learned what had happened. She spoke to police at the hospital, telling them defendant had spent time in prison and had sometimes mentioned fleeing to Mexico if he ever faced the possibility of going back. Earlier that month, defendant's daughter overheard her parents talking on the phone. Defendant said he was entitled to his wife's retirement savings under the terms of their divorce. He also said "it wasn't going to be good" if he found out she was in a relationship with someone else. Defendant's daughter knew that her mother was in a relationship at the time, but had not told her father about it. Her impression of defendant's attitude toward her mother was that, if he could not have her, he would kill her so no one else could either.

3

A sergeant responded to the scene and examined a car in the driveway that was registered to Rosemary Sanchez Espinoza. Both doors on the passenger side were open, the emergency lights were on, and there were signs of a struggle inside the car. The sergeant saw what appeared to be blood splattered throughout the driver's side of the car, on the gearshift, and on an ethernet cable. The ethernet cable also appeared to have hair on it. There was a purse with two cell phones inside it on the passenger seat, as well as a third cell phone on the backseat, and a shirt and sweater on the ground next to the car. Tire marks leading from the driveway to the street were red with what appeared to be blood. The sergeant interviewed defendant's children. Defendant's son told the sergeant defendant had threatened to "hurt" him and "get" his mother and her boyfriend; he did not say defendant had threatened to "kill" them.

The doctor who performed the autopsy found 53 external injuries and 14 internal injuries, which were consistent with asphyxiation and blunt force trauma. Certain injuries were consistent with a motor vehicle accident, and there was a tire mark on the victim's right arm. There were no injuries to her legs, suggesting she was already on the ground when she was run over. Some injuries to the face had to have been caused by something other than a car. In the doctor's opinion, the manner of death was asphyxiation caused by smothering and/or strangulation, although asphyxiation could possibly have been caused by being run over. Two types of strangulation were possible: manual strangulation and ligature strangulation.

When testifying about patterned abrasions to the victim's neck, the doctor said that such an injury "begs the question of the ligature." A defense objection was sustained and the testimony was stricken as speculative. Later, when shown a photograph of the ethernet cable found in the victim's car, the doctor recalled having seen it sometime after the date of the autopsy. Defense counsel objected to a follow-up question about the ethernet cable possibly being used as a ligature, stating no discovery had been provided about the doctor being shown the ethernet cable. As a result, the testimony was

4

interrupted and trial was continued for one month. Counsel later moved for sanctions based on prosecutorial misconduct, alleging that a crime lab DNA report on the ethernet cable and related correspondence had been withheld in violation of section 1054, an applicable discovery order, and *Brady v. Maryland* (1963) 373 U.S. 83.

After further continuances, testimony resumed in January 2023 with the motion for sanctions pending. A criminalist testified that she had performed testing on the ethernet cable. Apparent blood and hair on the cable contained a mixture of the victim's DNA and someone else's. The doctor resumed her testimony from August 2022 and again stated that the patterned abrasions on the victim's neck suggested the possibility of ligature strangulation. Defense counsel again objected to the testimony as speculative, the trial court again sustained the objection, and the testimony was again stricken.

Following the close of evidence, the parties orally argued the motion for sanctions. Defense counsel acknowledged that any possible *Brady* violation had been remedied by the granting of a continuance and the eventual disclosure of the allegedly exculpatory evidence. Counsel also acknowledged that any prejudice from the discovery violation had been "significantly lessened" by the trial court's response to the situation, including the continuance and the exclusion of speculative testimony about ligature strangulation. As a remedy, counsel requested "an acknowledgment that the Court's discovery order was violated and an admonition" that prejudice could have resulted from the prosecutor's actions had the proceedings gone differently. The prosecution conceded a statutory discovery violation and explained that the violation was unintentional. The court found that a discovery violation occurred, admonished the prosecutor, and issued no further sanctions.

The trial court found defendant guilty of first degree murder. Defendant moved to dismiss his prior strike convictions under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, and the court denied the motion. The court imposed a sentence of 126 years to life, consisting of: 75 years to life for first degree murder as a third strike, plus a

one-year enhancement for use of a deadly weapon, for a total sentence of 76 years to life on count 1; a consecutive term of 25 years to life on count 3; and a consecutive term of 25 years to life on count 4. Defendant was credited with time served on counts 2 and 5.

## II.   DISCUSSION

Defendant raises two issues in his supplemental brief. First, he takes issue with the trial court's handling of the section 1192 hearing and his motion for sanctions. He expresses his belief that "the trial judge had her mind made up" before the hearing, but there is no indication in the record that the court prejudged defendant's guilt of first degree murder. To the contrary, the record demonstrates the court ruled in defendant's favor on numerous evidentiary issues throughout the trial and granted a lengthy midtrial continuance when the prosecution's discovery violation came to light. With respect to the motion for sanctions, defendant asserts the existence of "critical evidence … showing fundamental unfairness and prejudice" stemming from prosecutorial misconduct. But as defense counsel acknowledged at the time the motion was ruled on, the immediate continuance and the ultimate exclusion of the primary evidence at issue ameliorated the possible prejudicial impact of the discovery violation. Defendant complains that his attorney "was not present in person" when the motion for sanctions was ruled on, leaving him "in the dark" with "unanswered questions" about the process, but the record indicates defendant was ably represented by counsel at the hearing in question.

The second issue raised by defendant relates to his *Romero* motion and the sentencing hearing. He contends he was incorrectly advised that the *Romero* motion and the imposition of sentence would be dealt with in separate proceedings, which left him unprepared for the sentencing hearing that took place at the time the *Romero* motion was denied. His claim is not supported by the record. The parties first appeared for sentencing on April 21, 2023, at which time the trial court heard victim impact statements. Both parties expressed their willingness to move forward on that date; defense counsel specified that she had believed it would be the "final court date," and her

6

"understanding was that the *Romero* motion and sentencing would be part of the same hearing." The court chose instead to take the matter under advisement and "set a date for the issuance of the *Romero* decision and sentencing." On that later date, May 12, 2023, the court denied the *Romero* motion and confirmed that there was no legal cause why judgment should not be pronounced. The court then sentenced defendant in accordance with applicable law, including mandatory sentencing provisions of the Three Strikes law. (§§ 667, subd. (e)(2), 1170.12, subd. (c)(2).)

Having carefully reviewed the entire record, we conclude there are no arguable issues on appeal. (*People v. Wende*, *supra*, 25 Cal.3d at pp. 441–443.)

### III. DISPOSITION

The judgment is affirmed.

_____

Grover, J.

**WE CONCUR:**


_____

Bamattre-Manoukian, Acting P. J.



_____

Lie, J.



H051119
*The People v. Espinoza*